Filed 4/12/22  P. v. Daniel CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B305658 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA442821) |
| v. | |
| DARIION DANIEL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, David V. Herriford, Judge.  Reversed and remanded with directions.

Mark R. Feeser, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, David Madeo and Blythe J. Leszkay, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## INTRODUCTION

A jury convicted Dariion Daniel of murder, robbery, kidnapping and carjacking following a trial covering two incidents in 2015 and 2016. Daniel argues the trial court committed prejudicial error by denying his motion to sever the trial of the two incidents and his motions under *Batson v. Kentucky* (1986) 476 U.S. 79, 89 and *People v. Wheeler* (1978) 22 Cal.3d 258, 276-277 (*Batson/Wheeler*) following the People's peremptory strikes of three Black prospective jurors.

We disagree. The trial court did not abuse its discretion in denying Daniel's motion to sever, and joinder did not result in gross unfairness. In addition, Daniel failed to make a prima facie showing of discrimination for one of the challenged strikes, and substantial evidence supported the court's finding the other strikes were not motivated by prejudice.

However, while the appeal was pending, the Legislature amended Penal Code[1] sections 1170, subdivision (b), and 654, subdivision (a), which may result in a shorter sentence for Daniel. The parties and the court agree judgment should be reversed for resentencing under the amended statutes.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *The Incidents and the Charges*

1. *December 20, 2015 carjacking, kidnapping and robbery*

Around 4:00 a.m. on December 20, 2015, Michael Yoshino was driving for Uber when he picked up three young Black male passengers at 46th Street and Vermont Avenue in Los Angeles. One man (who Yoshino later identified as Daniel) sat in the front passenger seat and instructed Yoshino to drive into an alley and

---

[1]     Undesignated statutory references are to the Penal Code.

stop the car. Daniel pulled out a gun and pointed it at Yoshino, demanding his wallet and cell phones. A man in the backseat reached into Yoshino's pocket and took his wallet while Daniel grabbed Yoshino's two cell phones. Daniel ordered Yoshino to get out of the car and lie face down on the ground while the three men discussed whether to shoot him.

The men brought Yoshino back to the car, demanded his ATM pin, and held him in the backseat at gunpoint. Daniel drove the car to a nearby convenience store, where he and another man withdrew $300 from Yoshino's bank account. They got back into the car, and Daniel resumed driving. Daniel told the two men in the backseat with Yoshino to "do your thing." The men in the backseat punched Yoshino in the head. Daniel stopped the car, and the men in the backseat dragged Yoshino out of the car and onto the ground. Daniel "stomped" on Yoshino's head, knocking him unconscious. When Yoshino regained consciousness, his car and the three men were gone.

2. *January 4, 2016 murder and robbery*

Around 7:00 p.m. on January 4, 2016, Stanley Montes, Raphael Munoz, and brothers Fernando and Albert Gomez[2] were playing basketball on a parking lot court near 42nd Place and South Figueroa Street in Los Angeles. Irving Garcia sat courtside and filmed the game on Montes's cell phone.

Two Black men approached Garcia and demanded his cell phone. Garcia complied. The two men approached Montes on the court. One of the men (who Fernando, Albert and Garcia later identified as Daniel) held a gun. Daniel argued with Montes.

---

[2] We refer to Fernando and Albert Gomez by their first names for clarity.

Daniel fatally shot Montes several times in the chest before leaving the scene with the other man.

### 3.    *The information*

The amended information charged Daniel with six crimes for the two incidents.  For the December 2015 incident, Daniel was charged with aggravated kidnapping for robbery (count 3; § 209, subd. (b)(1)); aggravated kidnapping for carjacking (count 4; § 209.5, subd. (a)), carjacking (count 5; § 215, subd. (a)) and robbery (count 6; § 211).  For the January 2016 incident, Daniel was charged with murder (count 1; § 187, subd. (a)) and robbery (count 2; § 211).  The information also specially alleged as to all counts that Daniel personally used a firearm (§ 12022.53, subd. (b)).  Daniel pleaded not guilty to the charges and denied the special allegations.

## B.    *The Motion To Sever*

Daniel's counsel moved to sever the trial of counts 1 and 2, arising from the January 2016 incident, from the trial of counts 3 through 6, arising from the December 2015 incident.  Defense counsel argued continued joinder[3] would prejudice Daniel's defense because evidence of the separate incidents would not be cross-admissible in separate trials, the incidents involved different motives, and the stronger identification evidence in the carjacking case would unfairly bolster the prosecution's weaker identification in the murder case, leading a jury to convict Daniel of murder based on identification in the carjacking.

The People opposed, arguing there were similarities between Yoshino's carjacking in December 2015 and Montes's murder in

---

[3]    The prosecutor previously successfully moved for joinder of the cases relating to the carjacking and murder incidents.

January 2016.  They occurred close in time and proximity.[4]  Each incident involved accomplices, the wrongful taking of cell phones, and Daniel's use of a gun.[5]  The prosecutor also argued both cases had "gang undertones."  Plus, because both incidents involved assaultive crimes, they were of the same class for purposes of joinder under section 954.  Finally, the prosecutor contested Daniel's characterization of the murder case as weaker than the carjacking case.

At the hearing, defense counsel argued the cell phone thefts were ancillary crimes, and joinder made it difficult for a jury to accept Daniel's misidentification defense as to each incident.  The prosecutor reiterated both incidents involved gang undertones and the same class of assaultive crimes, and neither case was weaker than the other.  Moreover, both offenses were reprehensible and potentially subjected Daniel to life sentences.

The trial court acknowledged the judicial economy in joinder and "agree[d] with the People that these are crimes of the same class.  They're close in time.  Close in proximity.  There are a certain number of similarities between the two incidents.  They

---

[4]    The parking lot basketball court where Montes was fatally shot is less than one mile from where Yoshino picked up Daniel.

[5]    Defense counsel argued it was unlikely the same gun was used in the two incidents, given Yoshino's testimony that Daniel pointed a revolver at him during the carjacking, and a detective's testimony that Montes was fatally shot with a semiautomatic.

both have gang undertones.  Both involve weapons.  So for those reasons the motion to sever is denied."[6]

C.    *The Voir Dire and* Batson/Wheeler *Motions*

During voir dire, the prosecutor exercised 16 peremptory strikes against prospective jurors, and defense counsel exercised 11.  Defense counsel made three *Batson/Wheeler* motions following the prosecutor's peremptory strikes of prospective jurors 1, 15 and 96, who were Black women.  The trial court denied the motions as discussed in detail below.  Ultimately, the jury panel that heard the case included two Black jurors.

D.    *The Trial*

1.    *December 2015 kidnapping, carjacking and robbery (counts 3-6)*

a.    *The prosecution's evidence*

Yoshino identified Daniel in court as the front passenger who had pulled a gun on him the night of the carjacking.  Yoshino testified that when he regained consciousness after the carjacking, he walked to a nearby business and called 911.  The responding police officers drove Yoshino around the area so he could point out where that night's events took place.  Yoshino saw his car traveling in the police patrol car's direction.  Yoshino's car pulled into a nearby driveway, and the driver got out and fled the scene.  The driver's clothes looked like those worn by the front passenger who pulled the gun on Yoshino that night.

---

[6]    Before voir dire, defense counsel moved for reconsideration of the motion to sever, arguing the jury might improperly use evidence of the carjacking as past-act character evidence to find Daniel guilty of Montes's murder.  The trial court denied the motion.

Investigators recovered one of Yoshino's cell phones and a convenience store receipt from his car. Investigators identified two suspects based on latent fingerprints pulled from Yoshino's car and showed Yoshino two six-pack photographic lineups about a month after the carjacking. Yoshino testified he recognized Daniel's photograph in the first lineup as the front passenger who pulled a gun on him the night of the carjacking, and he identified one of Daniel's accomplices in the carjacking in the second lineup. Detective Eric Good also testified to Yoshino's identification of Daniel and an accomplice.

A police forensic print specialist testified he compared the latent prints recovered from Yoshino's car the day after the carjacking with Daniel's prints. The expert said he was "very confident" that the same person had made both sets of prints.

An FBI special agent, who was a member of the agency's cellular analysis survey team, testified he analyzed Daniel's cell phone records and determined Daniel's phone was pinging cell towers close in time and proximity to both the carjacking and the murder.

A hospital doctor examined Yoshino the night of the carjacking. Yoshino did not display the key symptoms of and was not diagnosed with a concussion.

b. *The defense's evidence*

Cross-examination revealed discrepancies in Yoshino's recall of events and details from the night of the carjacking, including his description of the gun-wielding front passenger's physical characteristics and clothing. In addition, Yoshino acknowledged his glasses were knocked off during the carjacking and robbery, after which he could not see faces as clearly.

Defense counsel cross-examined the prosecution's forensic print specialist with a 2008 audit of his lab. Although the audit recommended blind verification[7] as a quality control measure, the lab no longer did it. A cognitive psychology professor testified about factors compromising eyewitness identification accuracy. A forensic DNA consultant testified it was possible to swab a car's interior for DNA evidence. But no DNA evidence was presented.

### 2. *January 2016 murder and robbery (counts 1 and 2)*

#### a. *The prosecution's evidence*

Fernando and Albert identified Daniel in court as the person who shot Montes and took Garcia's cell phone.

Albert testified that three days after the shooting, he saw a man on the street who had been involved in the shooting, and Albert placed an anonymous 911 call reporting his sighting. In a second 911 call, Albert reported that police had detained the man he had seen. When calling 911, Albert "definitely one hundred percent recognized" the man later identified as Daniel. Albert was "a hundred percent sure" when identifying Daniel in court that he was the man who had shot Montes.

Police detectives were interviewing Fernando about the shooting when Albert made his 911 calls. Detective Christopher Courtney testified that during the interview, they received a radio call stating a suspect in the shooting (Daniel) was detained nearby. The detectives transported Fernando to where Daniel was detained for a field show up. On the way to the field show up, Detective Courtney provided an admonishment to Fernando with

---

[7] Blind verification refers to when two forensic specialists separately compare fingerprints for a match and do not know each other's results until they both have completed the process.

instructions on how the field show up would be conducted. Both Fernando and Detective Courtney testified to Fernando's field identification of Daniel. Specifically, Fernando testified that he identified Daniel as the person who took Garcia's cell phone and shot Montes three days earlier. An audio recording of Fernando's field identification was admitted into evidence. Officer Alfredo Aguayo testified that during an interview the night of the shooting, Fernando described the shooter as someone of approximately the same build, height and ethnicity as Daniel.

Munoz testified to the shooter's height, build and skin color, all of which were like Daniel's.

When Garcia was shown Daniel's booking photo at trial, Garcia testified he recognized Daniel "a little bit," based on his facial hair, as the man who shot Montes and took Garcia's phone.

b. *The defense's evidence*

Defense counsel elicited testimony from Fernando and Munoz that Daniel had referred to his accomplice as his younger brother before the shooting. But a detective on the case did not find any information indicating Daniel had a younger brother.

Cross-examination revealed numerous inconsistencies between the eyewitnesses' descriptions to law enforcement of the shooter's purported height, age, complexion and facial attributes. Daniel had facial tattoos, but no eyewitness reported seeing tattoos on the shooter's face. Both Fernando and Albert testified nothing had stood out to them about the shooter's face on the night of the shooting. Albert acknowledged he initially told police detectives that he believed Daniel was the accomplice rather than the shooter, but he had talked to Fernando, who thought Daniel was the shooter.

9

Garcia testified he did not get a good look at the shooter's face. Garcia told defense counsel Garcia did not know whether Daniel was the shooter.

When Munoz was shown a photographic lineup four days after the shooting that had included Daniel's photograph, he did not recognize any of the individuals.

E.    *The Verdict and Sentencing*

The jury found Daniel guilty of all counts and found true the firearm allegations.[8] The trial court sentenced Daniel to an aggregate term of 50 years to life on count 1 (25 years to life for first degree murder plus 25 years to life for the firearm enhancement), plus 13 years on count 2 (the middle term of three years plus 10 years for the firearm enhancement) to run concurrently with the term imposed on count 1. The court imposed a life term plus 10 years (for the firearm enhancement) on count 3. The court stayed the sentences on the remaining counts under section 654.

---

[8]    Before sentencing, defense counsel moved for a new trial arguing, among other things, that the incidents should have been severed for trial, and that the evidence at trial showed the prosecution's carjacking case against Daniel was significantly stronger its homicide case. The trial court denied the motion.

## DISCUSSION

A. *The Trial Court Did Not Err by Denying Daniel's Motion To Sever, and Joinder Did Not Result in Gross Unfairness*

### 1. *Relevant law*

"Section 954 allows for the joint trial of 'two or more different offenses . . . of the same class of crimes or offenses.'"[9] (*People v. Gomez* (2018) 6 Cal.5th 243, 275 (*Gomez*).) "Joinder is ordinarily favored because it avoids the increased expenditures of funds and judicial resources that may result from separate trials. [Citation.] Joinder, therefore, 'is the course of action preferred by the law.'" (*People v. Simon* (2016) 1 Cal.5th 98, 122 (*Simon*).)

"Nonetheless, a trial court has discretion to sever properly joined charges in the interest of justice and for good cause." (*Simon, supra,* 1 Cal.5th at p. 122.)

### 2. *Standard of review*

Review of a trial court's denial of a motion to sever requires two steps.

In the first step, we review the order "for abuse of discretion." (*People v. Vargas* (2020) 9 Cal.5th 793, 817 (*Vargas*).) Specifically, "we examine whether, in light of the information available at the time, the trial court abused its discretion in denying the severance motion prior to the guilt phase. [Citation.]

---

[9] Section 954 provides in relevant part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts . . . . [T]he court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

Where, as here, the statutory requirements for joinder are met, a defendant must make a 'clear showing of prejudice' to establish that the trial court abused its discretion in denying the motion. [Citation.]  A defendant seeking severance of properly joined charged offenses must make a stronger showing of potential prejudice than would be necessary to exclude evidence of other crimes in a severed trial." (*Simon, supra,* 1 Cal.5th at pp. 122–123.)  "[T]he defendant must demonstrate the denial of his motion [to sever] exceeded the bounds of reason." (*People v. Capistrano* (2014) 59 Cal.4th 830, 848 (*Capistrano*), overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56 (*Hardy*).)

We look at four factors to determine if a trial court abused its discretion:  First, "we consider 'whether evidence of the crimes to be jointly tried is cross-admissible.' [Citation.]  Second, we address whether the charges are especially inflammatory.  Third, we consider whether a weak case has been joined to a strong one 'so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges.' [Citation.]  Finally, we consider whether joinder renders the case capital when it would not otherwise have been."[10]  (*Vargas, supra,* 9 Cal.5th at p. 817.)

In the second step of reviewing a denial of a severance motion, "[e]ven if a defendant fails to demonstrate the trial court's joinder ruling was an abuse of discretion when it was made, reversal may nonetheless be required if the defendant can demonstrate that 'the joint trial resulted in such gross unfairness as to amount to a due process violation.'" (*People v. Landry* (2016) 2 Cal.5th 52, 77 (*Landry*).)

---

[10]     Even without severance, Daniel did not face a capital case.

3.    *The trial court did not abuse its discretion by denying Daniel's motion to sever*

The amended information properly joined the December 2015 and January 2016 incidents under section 954. Murder, kidnapping and carjacking are all assaultive crimes against a person and consequently of the same class. (See *Vargas, supra,* 9 Cal.5th at p. 817; *Simon, supra,* 1 Cal.5th at p. 150; *Capistrano, supra,* 59 Cal.4th at p. 848.)

Daniel has not made a "clear showing of prejudice" (*Simon, supra,* 1 Cal.5th at p. 123) or demonstrated the trial court's denial of his motion to sever "exceeded the bounds of reason" (*Capistrano, supra,* at p. 848).

a.    *The evidence was not cross-admissible*

The People concede evidence of the carjacking and evidence of the murder would not be cross-admissible at separate trials.

But "'the absence of cross-admissibility does not, by itself, demonstrate prejudice.'" (*People v. Vines* (2011) 51 Cal.4th 830, 856, overruled in part on other ground as stated in *Hardy, supra,* 5 Cal.5th at p. 104; see *People v. Johnson* (2015) 61 Cal.4th 734, 751 ["absence of cross-admissibility cannot alone establish the substantial prejudice necessary to make severance mandatory"].) "'[T]he absence of cross-admissibility alone would not be sufficient to establish prejudice where (1) the offenses were properly joinable under section 954, and (2) no other factor relevant to the assessment of prejudice demonstrates an abuse of discretion.'" (*Capistrano, supra,* 59 Cal.4th at pp. 849–850.)

b.    *The carjacking was not especially inflammatory*

"'The animating concern . . . is not merely whether evidence from one offense is repulsive,' but "'whether ""strong evidence of a lesser but inflammatory crime might be used to bolster a weak

13

prosecution case" on another crime.""'" (*Gomez, supra,* 6 Cal.5th at p. 277; see *People v. Elliott* (2012) 53 Cal.4th 535, 553.) Where the evidence underlying each of the counts joined in a single trial is similar and equally reprehensible, the likelihood that particular evidence will "unduly inflam[e]" the jury is remote. (*People v. McKinnon* (2011) 52 Cal.4th 610, 631.) Moreover, "[t]he fact that evidence of two violent crimes might lead a jury to infer that a defendant is violent does not establish that any of the charges were unusually likely to inflame the jury." (*Landry, supra,* 2 Cal.5th at p. 78.)

Daniel's sole argument is the carjacking was more likely to inflame the jury than the murder because the carjacking was particularly "repulsive" given the random and violent nature of the assault.

We disagree that carjacking was more likely to inflame the jury. First, as Daniel concedes, an assaultive crime resulting in death is inherently more inflammatory than an assaultive crime not resulting in death. Second, there was strong evidence of the murder, including two eyewitnesses who identified Daniel as the shooter and another eyewitness who identified the man in Daniel's booking photo as the shooter. Third, comparing the two crimes, Montes's murder was more repulsive and inflammatory than Yoshino's carjacking. Daniel sought out Montes on the basketball court and fired four shots into Montes's chest at close range, at least three of which were independently fatal, in front of Montes's friends. While Yoshino testified Daniel had "stomped" on his head during the carjacking, Yoshino did not experience signs of a concussion when examined at the emergency room hours after the incident.

c.    *Spillover prejudice was unlikely*

"Even if the evidence in one case might be considered stronger than the other, '[a] mere imbalance in the evidence . . . will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges.'" (*People v. Thomas* (2012) 53 Cal.4th 771, 799.)  "Furthermore, the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried." (*People v. Soper* (2009) 45 Cal.4th 759, 781 (*Soper*).)  Instead, a defendant must show sufficient disparity among joined counts such that ""'the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges.'""" (*Capistrano*, *supra*, 59 Cal.4th at p. 848.)

Daniel contends the People's identification evidence was stronger for the carjacking than the murder.

We disagree.  The identification evidence in the two incidents was equally strong.  For the murder, three eyewitnesses testified and identified Daniel as the shooter.  Two witnesses, Fernando and Albert, identified Daniel in court and out of court.  One witness, Garcia, identified the man in Daniel's booking photo as the shooter.  For the carjacking incident, Yoshino testified and identified Daniel in and out of court as his assailant.  And Daniel's fingerprints were found in Yoshino's car.  Plus, Daniel's cell phone records placed him near both the murder and carjacking.

4.    *The joint trial did not result in gross unfairness*

"In determining whether joinder resulted in gross unfairness, [the Supreme Court has] observed that a judgment will

be reversed on this ground only if it is reasonably probable that the jury was influenced by the joinder in its verdict of guilt." (*Simon*, *supra*, 1 Cal.5th at pp. 129-130.) "Appellate courts have found "'no prejudicial effect from joinder when the evidence of each crime is simple and distinct, even though such evidence might not have been admissible in separate trials."'" (*Soper*, *supra*, 45 Cal.4th at p. 784.)

Daniel has failed to show it is reasonably probable the jury was influenced by joinder in its guilty verdicts. The evidence of the murder and carjacking incidents was simple and distinct. (See *Elliott*, *supra*, 53 Cal.4th at p. 552 [trial was not "grossly unfair" where the testimony of one or more eyewitnesses identified the defendant as the gunman involved in each incident].) None of the eyewitnesses or crime scene evidence overlapped. The trial court reinforced this evidentiary distinction to the jury at the transition from testimony concerning the murder to testimony about the carjacking: "So I think I mentioned to you at the beginning that there are two incidents involved. You've been hearing about the incidents that are the basis of counts 1 and 2. Now, we're going to switch over to . . . the separate incident that is the basis of counts 3, 4, 5 and 6."

B.    *The Trial Court Did Not Err by Denying Daniel's* Batson/Wheeler *Motions*

1.    *Relevant law*

"Both the United States and California Constitutions prohibit the exercise of peremptory strikes on the basis of race or ethnicity." (*People v. Battle* (2021) 11 Cal.5th 749, 772 (*Battle*), citing *Batson v. Kentucky, supra*, 476 U.S. at p. 89, and *People v. Wheeler, supra*, 22 Cal.3d at pp. 276-277.) "'[A] prosecutor, like any party, may exercise a peremptory challenge against anyone,

including members of cognizable groups.  All that is prohibited is challenging a person *because* the person is a member of that group.'" (*Hardy, supra,* 5 Cal.5th at p. 78; see *People v. Smith* (2018) 4 Cal.5th 1134, 1146 [a party "'may exercise a peremptory challenge for any permissible reason or no reason at all'"].)

"We follow a familiar three-step process in evaluating a defendant's *Batson/Wheeler* motion.  First, the defendant must make a prima facie case by showing facts sufficient to support an inference of discriminatory purpose.  [Citation.]  Second, if the defendant makes a prima facie showing, the burden shifts to the prosecutor to offer a permissible, nondiscriminatory explanation for the strike.  [Citation.]  Third, if the prosecutor offers a nondiscriminatory explanation, the trial court must decide whether that explanation is genuine, or whether impermissible discrimination in fact motivated the strike." (*Battle, supra,* 11 Cal.5th at p. 772.)  "The defendant has the ultimate burden of persuasion regarding the prosecutor's motivation." (*Hardy, supra,* 5 Cal.5th at p. 81; see *People v. Gutierrez* (2017) 2 Cal.5th 1150, 1158 (*Gutierrez*) ["In order to prevail, the movant must show it was "'more likely than not that the challenge was improperly motivated.'"'].)

On the third step, ""[t]he proper focus of a *Batson/Wheeler* inquiry . . . is on the subjective *genuineness* of the race-neutral reasons given for the peremptory challenge, *not* on the objective reasonableness of those reasons . . . .  All that matters is that the prosecutor's reason for exercising the peremptory challenge is sincere and legitimate, legitimate in the sense of being nondiscriminatory."' [Citation.]  ""[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how

17

reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.' " ' " (*People v. Miles* (2020) 9 Cal.5th 513, 539 (*Miles*).)

To assist the court in reaching its conclusion, a comparative juror analysis "may be probative of purposeful discrimination at Batson's third stage." (*Gutierrez, supra,* 2 Cal.5th at p. 1173; see also *People v. Mills* (2010) 48 Cal.4th 158, 177 [" '[c]omparative juror analysis is a form of circumstantial evidence' [citation] courts can use to determine the legitimacy of a party's explanation for exercising . . . peremptory challenge[s]"].) "When a court undertakes comparative juror analysis, it engages in a comparison between, on the one hand, a challenged panelist, and on the other hand, similarly situated but unchallenged panelists who are not members of the challenged panelist's protected group." (*Gutierrez*, at p. 1173.) In this case, a comparative analysis would compare Black prospective jurors stricken by the prosecutor based on a specific justification and similarly situated prospective jurors of a different race whom the prosecutor did not challenge.

" ' " ' "[T]he trial court is not required to make specific or detailed comments for the record to justify every instance in which a prosecutor's race-neutral reason for exercising a peremptory challenge is being accepted by the court as genuine.' " ' " [Citation.] But " '[w]hen the prosecutor's stated reasons are either unsupported by the record, inherently implausible, or both, more is required of the trial court than a global finding that the reasons appear sufficient.' " (*Miles*, *supra*, 9 Cal.5th at p. 539.)

### 2. *Standard of review*

When a trial court has denied a *Batson/Wheeler* motion on the first step, "we independently review the legal question whether the trial court was required to elicit justifications" for the

challenged peremptory strike.  (*Unzueta v. Akopyan* (2019) 42 Cal.App.5th 199, 213; accord, *People v. Parker* (2017) 2 Cal.5th 1184, 1211 ["'we review the record independently to "apply the high court's standard and resolve the *legal* question whether the record supports an inference that the prosecutor excused a juror" on a prohibited discriminatory basis'"]; *People v. Edwards* (2013) 57 Cal.4th 658, 698 ["we independently review the record and determine whether it 'supports an inference that the prosecutor excused a juror on the basis of race'"].)  "Certain types of evidence are especially relevant to this inquiry, including whether the prosecutor has struck most or all of the members of the venire from an identified group, whether a party has used a disproportionate number of strikes against members of that group, whether the party has engaged prospective jurors of that group in only desultory voir dire, whether the defendant is a member of that group, and whether the victim is a member of the group in which the majority of the remaining jurors belong.  [Citation.]  We may also consider nondiscriminatory reasons for the challenged strikes that are 'apparent from and "clearly established" in the record.'  [Citation.]  Yet we may do so only when these reasons 'necessarily dispel any inference of bias,' such that "'there is no longer any suspicion . . . of discrimination in those strikes.'""  (*Battle*, *supra*, 11 Cal.5th at p. 773.)

When a trial court has denied a *Batson / Wheeler* motion on the "third-step determination on the ultimate issue of purposeful discrimination, we apply the deferential substantial evidence standard."  (*Elliott, supra,* 53 Cal.4th at 559.)  In general, "'[r]eview of a trial court's denial of a *Wheeler*/*Batson* motion is deferential, examining only whether substantial evidence supports its conclusions.  [Citation.]  "We review a trial court's determination regarding the sufficiency of a prosecutor's

justifications for exercising peremptory challenges "'with great restraint.'" [Citation.] We presume that a prosecutor uses peremptory challenges in a constitutional manner and give great deference to the trial court's ability to distinguish bona fide reasons from sham excuses. [Citation.] So long as the trial court makes a sincere and reasoned effort to evaluate the nondiscriminatory justifications offered, its conclusions are entitled to deference on appeal.'"'"[11] (*Miles*, *supra*, 9 Cal.5th at p. 539.)

"'When a defendant asks for comparative juror analysis for the first time on appeal, [the Supreme Court has] held that "such evidence will be considered in view of the deference accorded the trial court's ultimate finding of no discriminatory intent."'" (*Miles*, *supra*, 9 Cal.5th at p. 541; see *People v. Krebs* (2019) 8 Cal.5th 265, 293.)

---

[11] In 2020, the Legislature passed Assembly Bill 3070, which enacted Code of Civil Procedure section 231.7 and codified the principle that peremptory challenges may not be based on "race, ethnicity, gender, gender identity, sexual orientation, national origin, or religious affiliation, or the perceived membership of the prospective juror in any of those group." (Stats. 2020, ch. 318, §§ 1-3; see Code Civ. Proc., § 231.7, subd. (a).) The statute imposes new requirements on the party exercising a preemptory challenge, the trial court's evaluation of an objection to a preemptory challenge and the standard of appellate review, including de novo review of a denial of an objection made under the statute. (Code Civ. Proc., § 231.7, subds. (c)-(g), (j).) The changes are effective for criminal trials in which jury selection begins on or after January 1, 2022. (Code Civ. Proc., § 231.7, subd. (i).) Because Daniel was tried in 2018 the new law does not apply to him.

3. *Juror 1: Daniel failed to make a prima facie showing of discrimination*

a. *Voir dire responses*

Juror 1, a Black woman, worked as a bank call center supervisor. Someone close to her had been arrested, and Juror 1 believed that person had been treated fairly. Juror 1 had been a victim of attempted car theft but had not called the police.

Juror 1 said she previously served on two juries, one of which did not reach a verdict. She found it frustrating when the jury could not agree but believed the jurors had an honest difference of opinion.

b. Batson/Wheeler *motion*

The prosecutor exercised his tenth peremptory challenge against Juror 1. Defense counsel objected, made a *Batson/Wheeler* motion, and requested a mistrial, arguing at sidebar that Juror 1 did not say anything tending to show bias and that Juror 1's race raised a protected class issue. The trial court responded, "I don't find a prima facie case at this time. I'll deny any request for a mistrial at this point. People don't need to put anything on the record, but if you want to you can." The prosecutor offered, "The primary reason for excusing juror number 1 is that they previously served on a hung jury and we're looking for people to resolve this case and not people who come in and who have previously been in a situation where they're okay with not being able to resolve the case in their minds. There's nothing about this that is protective [sic]. And, for the record, there still remains [sic] two other African American jurors on the panel." The trial court replied, "All right. Thank you," and excused Juror 1.

21

c.   *Analysis*

The trial court denied Daniel's *Batson*/*Wheeler* motion to the People's peremptory strike of Juror 1 at the first step.[12]

The trial court was not required to elicit a justification for the challenged strike because the record did not support an inference the prosecutor struck Juror 1 based on race.  Juror 1 appears to have been the tenth prospective juror struck by the People but the first Black individual.  And two other Black prospective jurors remained on the panel.[13]

In any case, the prosecutor provided a nondiscriminatory reason for striking Juror 1.  Juror 1 had served on a jury that failed to reach a verdict after deliberation.  More importantly, Juror 1 had been frustrated by the experience.  "[T]he circumstance that a prospective juror has previously sat on a hung

---

[12]   Daniel argues this court should analyze each of his *Batson/Wheeler* motions at the third step because the trial court "did not clearly indicate whether it found a prima facie case," and "solicited and relied on the prosecution's stated reasons" for the strikes.  Not true.  The trial court explicitly said it did not find a prima facie case for Juror 1.  Although the court invited the prosecutor to make a record of its reasons for striking Juror 1, the court refrained from ruling on the proffered reason.  "[A]n appellate court properly reviews the first-stage ruling if the trial court has determined that no prima facie case of discrimination exists, then allows or invites the prosecutor to state reasons for excusing the juror, but refrains from ruling on the validity of those reasons."  (*People v. Scott* (2015) 61 Cal.4th 363, 386.)

[13]   In a March 22, 2021 letter to the superior court, the People noted prospective jurors completed juror questionnaires during voir dire, but that these questionnaires were not part of the appellate record.

22

jury is a legitimate, race-neutral neutral reason for exercising a strike." (*People v. Manibusan* (2013) 58 Cal.4th 40, 78 (*Manibusan*); accord, *People v. Reed* (2018) 4 Cal.5th 989, 1001 (*Reed*); *People v. Winbush* (2017) 2 Cal.5th 402, 438-439 (*Winbush*) ["Prior experience on a hung jury 'constitutes a legitimate concern for the prosecution, which seeks a jury that can reach a unanimous verdict.'"].)  That Juror 1 was struck for a race-neutral reason is highlighted by the fact that the prosecutor had already struck a non-Black juror, Juror 40, who previously served on a jury that deliberated but disagreed on a verdict.

> 4. *Juror 15:  Substantial evidence supported the trial court's finding the strike was not motivated by discrimination*
>
> a. *Voir dire responses*

Juror 15, also a Black woman, said she worked for the Los Angeles County Department of Children and Family Services in the bureau of finance and administration, collecting money from lenders and sometimes daycare centers.  She worked on the clerical side, was not involved in department investigations, and did not work directly with social workers.  She had an aunt who worked as a clerk for the sheriff's department and another aunt who worked as a human resources manager for the probation department.  She had positive experiences with Pasadena police officers when she worked with the Pasadena school district.  When the court asked Juror 15, "It sounds to me like you can be fair and impartial, right?"  Juror 15 responded, "Yes."

Defense counsel asked Juror 15 whether she would want a juror with her state of mind if she were in Daniel's seat.  Juror 15 responded she would because she would be "fair" and "honest about it."  She added that her job required her to "judge whether

or not someone is—if their paperwork is correct or whatnot. And I just can't look at one side and say, yeah, you're lying or no you're not. I have to look at all sides of it and come up with a solution." Juror 15 confirmed that if, after deliberating, the other jurors were prepared to vote guilty, but she was not convinced the People had proved their case beyond a reasonable doubt, she would be able to stick to her position.

The prosecutor asked Juror 15 about expert witness testimony, "[W]hat are some of the things you would consider in determining how much weight to give someone's testimony?" Juror 15 responded she would consider "how long they've been in the field." When asked whether she would believe an expert astrologer who had 45 years of experience and said the moon was made of blue cheese, Juror 15 said she "would think he was lying to me" because she had seen pictures of the moon and knew it was not made of cheese. In response to the prosecutor's questions, Juror 15 said she did not have a problem using circumstantial evidence even in the absence of direct evidence. But she clarified she "probably" could conclude the prosecutor was sitting in a chair if he left his fingerprint there and his pencil box, phone, business cards, and coffee cup, noting that other prosecutors could have been sitting in the chair, but no one looked for their fingerprints. The prosecutor asked no other questions of Juror 15.

b.    Batson/Wheeler *motion*

The prosecutor used his eleventh peremptory challenge to excuse Juror 15 from the panel. Defense counsel again objected, saying at sidebar, "Same argument. Same request." The trial court requested to hear from the prosecutor, who replied, "I'm excusing her because she does work for the Department of Children and Family Services. After some consideration, I'm not

[sic] looking based on her occupation, but I think it's one that involves listening to a lot and shuffling through a lot of paperwork with a lot of people and telling conflicting stories and something that involves social services. And based on her occupation, I don't feel that she would be the appropriate juror in this case."

Defense counsel responded he understood Juror 15 to work in "more of like a clerical job. I don't believe there's anything in the record that she is dealing with high pressure [o]r high emotional situations. And I think even if that was the case, I don't think that's a reasonable reason to dismiss her. I don't think there's any basis whatsoever that she has given in any of her answers to suggest that she could be anything but fair and impartial, and I would ask that she be allowed to s[t]ay on the jury as the remedy."

The trial court replied, "when I heard her answers I didn't see that she's a clerical person, so I don't know. I mean, obviously, I must accept your explanations unless they're completely illogical." When the court asked whether the prosecutor wanted to add anything to the record, the prosecutor said, "It's no more illogical than excusing people who work in elementary schools or any other particular line of work. I do think that as clerical staff one of her duties is going to be reviewing and typing reports. She has contact with that. Also, I'll note that there is one African American left on the panel that has not been kicked." The court observed, "Last time you noted there were two." The prosecutor continued, "there's also a number of peremptory challenges that have all been exercised across the board against men, women, Hispanics, whites," at which point the court interjected, "But not Black." The court continued, "I'll just say these issues are always very difficult. And I'm a little concerned about this one only because her answers were very thoughtful and she seemed like a

very neutral person.  However, I have to look at the overall picture.  And out of all of the [peremptory challenges], I think the defense has excused one African American juror and the People have excused two.  And given the overall number of people excused, I can't say that I see a pattern of discrimination at this point.  But I am concerned.  I'll just say that.  So I will deny the request at this time."

Defense counsel noted that the Black prospective juror he had struck was an "ex-LAPD gang police officer."  The trial court responded, "I understand why you excused him.  And I'm certainly not saying that was racially based at all.  That was perfectly logical.  I'm just looking at the numbers.  Because, again, the fact that you excused him, the People probably would have accepted him . . . .  I'm just looking at it that way."  Defense counsel added, "For the record, I am asking for remedy.  I'm asking for her to remain seated.  If the court is unwilling to do that, I'm asking for a new panel.  If the court is not willing to do that, I'm asking for a mistrial."  The trial court concluded, "all of those requests are denied on the basis that I'm not making a finding that that particular exercise of peremptory is unconstitutionally based."

### c.    *Analysis*

The trial court denied Daniel's *Batson*/*Wheeler* motion regarding Juror 15 at the third step.  The court's implied finding the prosecutor's race-neutral explanation was genuine and legitimate is supported by substantial evidence.

First, the prosecutor gave a nondiscriminatory reason for the challenged strike, supported by the record.  The prosecutor said he struck Juror 15 because she worked for a social services agency— the Department of Children and Family Services.  Daniel concedes that a prosecutor may permissibly exercise a peremptory strike

26

against a prospective juror based on his or her employment in a social services field.  (See *People v. Clark* (2011) 52 Cal.4th 856, 907 [concluding as to juror who helped homeless people obtain social service benefits, "[a] peremptory challenge based on a juror's experience in counseling or social services is a proper race-neutral reason for excusal"].)  Even though Juror 15 worked in a clerical job and did not work directly with social workers, substantial evidence supports the trial court's implied finding the prosecutor's belief was genuine that people working for agencies like the Department of Children and Family Services are ill-suited to serve as jurors because they are not sympathetic to the prosecution.  (See *People v. Chism* (2014) 58 Cal.4th 1266, 1316 ["A peremptory challenge may be based on employment [citation], and '"hunches[,]" and even "arbitrary" exclusion is permissible, so long as the reasons are not based on impermissible group bias"]; *People v. Reynoso* (2003) 31 Cal.4th 903, 924-925 [although prosecutor's stated basis for a challenge to a prospective juror that she was a customer service representative and therefore lacked sufficient educational experience was not objectively persuasive, that did not mean the justification was not sincere and legitimate].)  "Whether a prosecutor's generalizations about a given occupation have any basis in reality or not, a prosecutor 'surely . . . can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected.'"  (*People v. Trinh* (2014) 59 Cal.4th 216, 242; accord, *Reynoso*, at pp. 924-925.)

Second, substantial evidence supports the trial court's finding, after reviewing each side's peremptory challenges and the makeup of the remaining panel, that there was not a pattern of discriminatory challenges.  Counsel had collectively exercised 18 peremptory strikes "against men, women, Hispanics, [and]

27

Whites" before the prosecutor requested to excuse Juror 15. Defense counsel had excused one Black juror, and the prosecutor had excused two Black jurors (Juror 1 and Juror 15). Moreover, the court noted "the People probably would have accepted" the Black juror excused by defense counsel, who had been a Los Angeles Police Department gang police officer (although we recognize that prosecutors typically would like to have police officers on the jury). And the jury panel still included one Black prospective juror.

Third, as Daniel acknowledges, two Black jurors remained on the panel for trial after an additional jury panel was brought into the courtroom and questioned. "[U]ltimate inclusion on the jury of members of the group allegedly targeted by discrimination indicates "'good faith'" in the use of peremptory challenges, and may show under all the circumstances that no *Wheeler/Batson* violation occurred." (*People v. Garcia* (2011) 52 Cal.4th 706, 747-748; see *People v. Bell* (2007) 40 Cal.4th 582, 599 [no inference of discrimination where the jury included three Black men, even though the prosecutor had exercised peremptory challenges against two of three Black women], disapproved on another ground as stated in *People v. Sanchez* (2016) 63 Cal. 4th 665, 686; *People v. Arias* (1996) 13 Cal.4th 92, 136, fn. 15 [the number and order of minority prospective jurors challenged, compared to the representation of such minority groups in the entire venire, was not sufficient to establish prima facie case, particularly where the jury included members of the same minority groups]; *People v. Jones* (2017) 7 Cal.App.5th 787, 803, 806 [no inference of discrimination where the prosecutor exercised three of nine peremptory challenges against Black prospective jurors but retained two Black jurors on the panel].)

Daniel's counterarguments are unpersuasive.

Daniel argues the trial court failed to adequately scrutinize the People's justification based on its finding it had to accept the People's explanations unless they were illogical or nonsensical, but this was inconsistent with the court's duty to make "a 'sincere and reasoned effort to evaluate the nondiscriminatory justifications offered.'" (*Gutierrez, supra*, 2 Cal.5th at p. 1159.)

But when a prosecutor's reason for striking a prospective juror is not inherently implausible and is supported by the record, "'"the trial court need not question the prosecutor or make detailed findings."'" (*Hardy, supra*, 5 Cal.5th at p. 76; accord, *Gutierrez, supra*, at pp. 1159, 1171.) Although the trial court acknowledged the striking of Juror 15 caused the court to be "concerned," and we agree, the justification provided by the prosecutor was plausible and supported by the record. (See *Miles, supra*, 9 Cal.5th at pp. 540-541 ["the trial court could have done more to make a fuller record," but because "the record show[ed] that the court considered the prosecutor's reasons," and "those reasons were plausible and supported by the record," "the trial court's findings [were] entitled to deference"]; *People v. Baker* (2021) 10 Cal.5th 1044, 1080 [the law "does not require a court in all circumstances to articulate and dissect at length the proffered nondiscriminatory reasons for a strike," and "deference is appropriate" where the trial court makes "a sincere and reasoned effort to evaluate the justifications proffered"]; see *People v. Mai* (2013) 57 Cal.4th 986, 1053-1054 ["terse ruling" not incompatible with sincere and reasoned effort to evaluate prosecutor's reasons where those reasons were plausible and supported by the record]; *People v. Jones* (2011) 51 Cal.4th 346, 361 ["the [trial] court was not required to do more than what it did" where it denied *Batson/Wheeler* motion after listening to prosecution's reasons for its peremptory challenges and inviting

defense counsel to respond].)  We defer to the court's credibility determination.  (*People v. Smith*, *supra*, 4 Cal.5th at p. 1158.)

Daniel also argues the prosecutor's reason for the strike was likely a pretext to exclude a Black juror.  Daniel contends the prosecutor's failure to ask Juror 15 any questions during voir dire about her job belied the sincerity of the prosecutor's justification for striking Juror 15 based on that job.  But both the trial court and defense counsel had questioned Juror 15 about her job.  (See *People v. Melendez* (2016) 2 Cal.5th 1, 19 [prosecutor's failure to question a challenged juror was "of little significance" where the court used a questionnaire and attorneys for the defendants questioned the juror at length].)

Finally, Daniel's comparative juror analysis on appeal is unconvincing.  Daniel's analysis ignores the primary reason given for the People's strike—Juror 15's employment at a social services agency—and selectively compares Juror 15 to prospective jurors of other races whose jobs included clerical duties and review of paperwork in private professional services firms.

> 5.      *Juror 96:  Substantial evidence supported the trial court's finding the strike was not motivated by discrimination*
>
> a.      *Voir dire responses*

Juror 96, also a Black woman, owned and managed a childcare center.  She said she was a good judge of credibility and could be fair to both sides.  She had been close to her late father-in-law, a former police officer with the airport police department, and she had neutral feelings about police officers in general.

Juror 96 said that she served as the foreperson on a jury about 10 years prior, that the jury failed to reach a verdict, and that she had found the experience frustrating in part because she

held the minority opinion on that jury. When asked whether the jurors in that case had an honest disagreement or whether she believed some jurors had not followed the rules, she responded, "I think that it was kind of honest. It was just I think that the lawyers probably could have done a better job as far as letting us know some stuff was muddy. So because it was muddy that way, we just couldn't come up with an actual verdict on it." She believed some of the jurors "just didn't understand the instructions given by the judge. And even though we tried to explain it, we just did not come to an agreement." The "prosecutor wasn't compelling enough" in that case.

b. Batson/Wheeler *motion*

The prosecutor used his sixteenth peremptory challenge to excuse Juror 96 from the panel. Defense counsel objected, saying at sidebar, "That's the third African American juror being kicked by the People. We're making the objection as we did on the previous for *Batson-Wheeler* and we're asking for her to remain seated as a juror." The trial court replied, "I think there may be a prima facie case, but let me hear from the People." The prosecutor explained, "This particular juror indicated that she was previously on a hung jury. As I previously indicated, we're removing jurors who we believe were previously on hung juries. Not only that, but during questioning she suggested that she was in the minority and voted not guilty on that hung jury. I also note there is not one but two African American jurors on this panel." The trial court concluded, "The court again has to accept those explanations unless they're completely nonsensical. And she did make those statements regarding the other jury. So I will deny your challenge at this time and I will release her. She'll be excused."

31

c. *Analysis*

The trial court denied Daniel's *Batson*/*Wheeler* motion regarding Juror 96 at the third step. Again, although not explicit, the trial court necessarily found the prosecutor's race-neutral explanation credible.

The court's finding is supported by substantial evidence.

First, the prosecutor gave a nondiscriminatory reason for the challenged strike, supported by the record. The prosecutor struck Juror 96 because she previously had served on a hung jury and had held a minority opinion on that jury. As discussed, "the circumstance that a prospective juror has previously sat on a hung jury is a legitimate, race-neutral neutral reason for exercising a strike." (*Manibusan, supra,* 58 Cal.4th at p. 78; accord, *Reed, supra,* 4 Cal.5th at p. 1001; *Winbush, supra,* 2 Cal.5th at pp. 438-439.) Moreover, as with Juror 1, the fact the prosecutor had already struck a non-Black juror, Juror 40, who had previously served on a hung jury, lends credibility to the People's reason for striking Juror 96.

Second, the final jury panel included two Black jurors, indicating Juror 96 was struck in good faith for a nondiscriminatory reason. (See *People v. Garcia* (2011) 52 Cal.4th 706, 747-748.)

Contrary to Daniel's contention, the trial court did not fail to scrutinize the People's justification. Where, as here, the prosecutor provided a legitimate reason for a strike, that reason was supported by substantial evidence in the record, and the trial court listened to both the prosecutor's explanations and defense counsel's response, the law does not require the court to articulate its analysis at length before its findings are entitled to deference. (*People v. Baker, supra,* 10 Cal.5th at p. 1080; *People v. Mai,*

*supra*, 57 Cal.4th at pp. 1053-1054; *People v. Jones, supra*, 51 Cal.4th at p. 361; *People v. Smith, supra*, 4 Cal.5th at p. 1158.)

C.     *Daniel Is Entitled to Resentencing Under A.B. 518 and S.B. 567*

The parties agree and the court concurs Daniel is entitled to retroactive application of Assembly Bill 518 (Stats. 2021, ch. 731, § 1.3); (2) Assembly Bill No. 518 (2021-2022 Reg. Sess. (A.B. 518)) and Senate Bill 567 (2021-2022 Reg. Sess. (S.B. 567).

The Legislature passed these bills while this appeal was pending. When Daniel was sentenced, section 654, subdivision (a) "required an act or omission punishable in different ways by different laws to be punished under the law that provided for the longest potential term of imprisonment. A.B. 518 amended Penal Code section 654 [subdivision (a)] to afford sentencing courts the discretion to punish the act or omission under either provision." (*People v. Mani* (2022) 74 Cal.App.5th 343, 351). The amended statute could change Daniel's sentence on counts 3, 4, 5 and 6 and shorten his sentence. Likewise, when Daniel was sentenced, section 1170, subdivision (b), gave the court discretion to choose whether to impose the lower, middle or upper prison term in the interest of justice. S.B. 567 amended subdivision (b) to require the imposition of the low term if, among other things, youth or a defendant's psychological, physical or childhood trauma contributed to the offense "unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the low term would be contrary to the interest of justice." (§ 1170, subd. (b)(6)(A)-(B).) The amended statute could potentially change Daniel's sentence on counts 2, 5 and 6 and shorten his sentence.

Because his judgment is not yet final and these statutes were amended to lessen the punishment for his crimes, he should be resentenced in light of them.  "If the amendatory statute lessening punishment becomes effective prior to the date the judgment of conviction becomes final then, in our opinion, it, and not the old statute in effect when the prohibited act was committed, applies."  (*In re Estrada* (1965) 63 Cal.2d 740, 744.)

## DISPOSITION

The judgment is reversed, and the case is remanded for resentencing.


IBARRA, J.*


We concur:


SEGAL, Acting P. J.


FEUER, J.

---

*       Judge of the Santa Clara County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.